UNITED STATES ᴇx ʀᴇʟ. CHAPMAN, SECRETARY
OF THE INTERIOR, *v.* FEDERAL POWER
COMMISSION ᴇᴛ ᴀʟ.

NO. 28.

Argued October 22, 1952.—Decided March 16, 1953.

*Gregory Hankin* argued the cause and filed a brief for petitioner in No. 28.

*Robert Whitehead* argued the cause and filed a brief for the Virginia REA Association et al., petitioners in No. 29.

*Bradford Ross* argued the cause for the Federal Power Commission, respondent. With him on the brief were *Willard W. Gatchell, John Mason* and *Howard E. Wahrenbrock.*

*T. Justin Moore* argued the cause for the Virginia Electric & Power Co., respondent. With him on the brief were *George D. Gibson* and *Patrick A. Gibson.*

*Charles F. Rouse* and *David W. Robinson* submitted on brief for the Carolina Power & Light Co., respondent.

*Herbert B. Cohn* submitted on brief for the Appalachian Electric Power Co., respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

In these two cases, the Secretary of the Interior and an association of nonprofit rural electric cooperatives have challenged the authority of the Federal Power Commission to grant to the respondent power company, VEPCO, a license to construct a hydroelectric generating station at Roanoke Rapids, North Carolina. They claim that Congress, by approving a comprehensive plan set out in the Flood Control Act of 1944 for improvement of the Roanoke River Basin, has withdrawn all eleven sites proposed for development in the plan, including Roanoke Rapids, from the licensing jurisdiction of the Commission and has reserved them for public construction. The underlying premise, that the plan approved by Congress presupposed federal development of all sites included in the plan, also underlies petitioners' other main conten-

tion here, that the Commission's concurrence in the plan constituted a determination by the Commission that the development of these water resources should be undertaken by the United States itself. Such a determination, they say, requires the Commission under § 7 (b) of the Federal Power Act, 41 Stat. 1067, as amended, 49 Stat. 842, 16 U. S. C. § 800 (b), to make investigations and submit its findings together with appropriate recommendations to Congress and in any event bars the Commission from approving applications for private construction of the project. Petitioners unsuccessfully raised these contentions, along with attacks on the Commission's findings not pressed here, before the Court of Appeals for the Fourth Circuit, which denied their petitions to set aside the Commission's order granting a license to VEPCO. *United States* v. *Federal Power Comm'n,* 191 F. 2d 796. We granted certiorari, 343 U. S. 941. The cases present questions of importance in that they involve a conflict of view between two agencies of the Government having duties in relation to the development of national water resources. Determination of the issues may affect a substantial number of important potential sites for the development of hydroelectric power. Cf. Rules Sup. Ct. 38 (5)(b).

Both here and in the court below, petitioners' standing to raise these issues has been questioned. The Secretary of the Interior points to his statutory duty to act as sole marketing agent of power developed at public hydroelectric projects and not required for the operation of the project; § 5 of the Flood Control Act of 1944 directs him to transmit and dispose of such power in a manner calculated to "encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles." 58 Stat. 890, 16 U. S. C. § 825s. This provision, it is said, announces a congressional policy for the guidance of the Secretary that would

be disturbed by the respondent company's plan; thus a specific interest of the Secretary, in addition to his more general duties relating to the conservation and utilization of the Nation's water resources, is said to be adversely affected by the Commission's order. The REA Association, an association of cooperatives, asserts that, as an organization of consumers entitled, along with "public bodies," to a preference in sales by the Secretary under § 5, it has a substantial interest in the development of low-cost power at the Roanoke Rapids site and consequently in the kind of instrumentality, public or private, to which power development at this site is committed. Respondents say, however, that decisions of policy in the construction of power projects have been entrusted to the Commission, or at most also to the Secretary of the Army, under whom the Corps of Engineers performs its statutory functions of making surveys and constructing public works, and that the interests of petitioners arise only after a public project has been constructed and the Secretary of the Army has determined that there is excess power to be distributed and sold.

We hold that petitioners have standing. Differences of view, however, preclude a single opinion of the Court as to both petitioners. It would not further clarification of this complicated specialty of federal jurisdiction, the solution of whose problems is in any event more or less determined by the specific circumstances of individual situations, to set out the divergent grounds in support of standing in these cases.

Petitioners' main contention, that Congress has, by a series of enactments to be construed as part of an evolving assumption by the Federal Government of comprehensive authority over navigable waters, reserved the Roanoke Rapids site for public development and so has placed it beyond the licensing power of the Federal Power Commission, requires us to consider with some partic-

ularity the steps by which plans for the Roanoke Rapids project have unfolded. Petitioners' contention reduces itself to the claim that the authority of the agency to which Congress has delegated the responsibility for safeguarding the public interest in the private development of power resources has been revoked *pro tanto* by congressional action as to this particular site.

In 1927, the Army Engineers were authorized to make a specific survey of the Roanoke River by § 1 of the Rivers and Harbors Act, 44 Stat. 1010, 1015, which "adopted and authorized" enumerated "works of improvement" including "surveys in accordance with" H. R. Doc. No. 308, 69th Cong., 1st Sess. (1926). That document, a milestone in the development of integrated federal planning for the use of the Nation's water resources, had recommended surveys of a large number of streams throughout the country, including the Roanoke River, "either for the preparation of plans for improvement to be undertaken by the Federal Government alone or in connection with private enterprise, or to secure adequate data to insure that waterway developments by private enterprise would fit into a general plan for the full utilization of the water resources of a stream." H. R. Doc. No. 308, 69th Cong., 1st Sess. 4. The detailed survey of the Roanoke River was transmitted to Congress in 1934; in it the Chief of Engineers stated that a comprehensive plan for navigation and power, flood control or irrigation "is not economically justifiable at the present time," H. R. Doc. No. 65, 74th Cong., 1st Sess. 2 (1935), and concurred in the judgment of the investigating engineer that "[t]here is no justification for any Federal expenditures for either flood control or power." *Id.*, at 53; cf. *id.*, at 14–15.

In 1936, Congress enacted the Flood Control Act of 1936, 49 Stat. 1570, defining the public interest in flood control as follows: "It is hereby recognized that destruc-

tive floods upon the rivers of the United States . . . constitute a menace to national welfare; that it is the sense of Congress that flood control on navigable waters or their tributaries is a proper activity of the Federal Government . . .; that the Federal Government should improve or participate in the improvement of navigable waters or their tributaries, including watersheds thereof, for flood-control purposes if the benefits to whomsoever they may accrue are in excess of the estimated costs, and if the lives and social security of people are otherwise adversely affected." 49 Stat. 1570, 33 U. S. C. § 701a. In the same Act, the Secretary of War was authorized to continue surveys at a number of localities, including "Reservoirs in Roanoke and Tar Rivers, North Carolina."[1] § 7, Act of 1936, 49 Stat. 1596. In § 6 of the Act, Congress provided that "the Government shall not be deemed to have entered upon any project for the improvement of any waterway mentioned in this Act until the project for the proposed work shall have been adopted by law." 49 Stat. 1592.

Following a destructive flood on the Roanoke River in 1940, the House Committee on Flood Control adopted a resolution requesting reappraisal of the previous reports on the Roanoke River to determine "whether any improvements in the interests of flood control and allied purposes are advisable at this time." See H. R. Doc. No. 650, 78th Cong., 2d Sess. 12 (1944). A similar resolution was adopted later by the House Committee on Rivers and Harbors, see *ibid.*, and as a result, the Corps of Engineers submitted its recommendations in a report which became H. R. Doc. No. 650, 78th Cong., 2d Sess.

---

[1] Section 6 of the Flood Control Act of 1938 authorized the Secretary of War to make surveys "for flood control" of the Smith River, a tributary of the Roanoke on which two of the eleven projects in the comprehensive Roanoke Basin plan are located. 52 Stat. 1223.

(1944). This report recommended the comprehensive Roanoke Basin plan here in issue. The report proposed a system of eleven dams and reservoirs, eight of them on the Roanoke River, and recommended authorization of two of those projects, designated Buggs Island and Philpott, "as the initial step." *Id.*, at 2.

Petitioners rely most strongly on two features of this report for their claim that Congress has, by approving the plan outlined in the report, withdrawn all sites in the plan from the licensing jurisdiction of the Federal Power Commission. As the report moved up through the hierarchy of the Corps of Engineers, comments upon the plan were made by the different responsible officers. The detailed report of the investigating engineer estimated costs, including interest, on bases obviously contemplating federal financing. These figures were accepted in the comments of each forwarding officer. Further, the Chief of Engineers, in submitting the report, stated, "To safeguard the interests of navigation and flood control, the dams and power facilities should be constructed, operated, and maintained under the direction of the Secretary of War and the supervision of the Chief of Engineers." *Ibid.* Neither the reports nor the comments of subordinates had contained any such suggestion or any engineering or other reasons why such a recommendation might be made, and the Chief of Engineers gave no reasons for his suggestion. Further, it is not clear from the context that the statement referred to all the projects and not simply to the two dams to be authorized, that is, the ones with flood-control features, or even that the words "under the direction . . . and the supervision" precluded construction by a private applicant; indeed, the order here granting the license specifically requires the licensee to "operate its project in such a manner as the Chief of Engineers, Corps of Engineers, Department of the Army, or his authorized

representative, may prescribe." We do not think these disconnected statements would justify us in saying that the report as it went to Congress plainly proposed that the Government construct all the projects in the plan. There are contrary indications in the report itself; particularly pertinent in the light of congressional practice is the strong emphasis put on the flood-control aspects of the two projects recommended for authorization. In any event, we do not have a recommendation for public construction that is clearly an integral part of the plan, and the decisive question is not what this or that isolated statement in the report or the comments thereon imply but how Congress may fairly be said to have received and read the report in the light of the legislative practice in relation to such public works.

It deserves mention that the Roanoke Rapids site, although comprehended in the plan and found to be the most desirable power site of all eleven units, was to be developed simply for the production of power. The District Engineer pointed out that the two projects recommended for early authorization would provide practically all the flood-control benefits to be derived from the plan; installations at the two sites, Buggs Island and Philpott, would "eliminate over 90 percent of the flood losses to the two main flood-damage areas in the Roanoke River Basin." *Id.,* at 88. At those two sites were to be built multiple-purpose reservoirs for flood control, water power, and low-water regulation, while at the other nine sites, with one minor exception, there were simply to be power projects.

As is customary, the Federal Power Commission was asked to comment on the proposal; by letter to the Chief of Engineers dated May 3, 1944, the Commission suggested some technical changes but concurred substantially in the recommendations of the Engineers, "that the comprehensive development of the Roanoke River Basin,

in general accordance with the plans prepared therefor by the district engineer consisting of 11 dam and reservoir projects with power, is desirable and that the Buggs Island and Philpott projects would constitute a desirable initial step in the development of the Roanoke River Basin." *Id.*, at 4.

The report was presented to Congress while the bill that became the Flood Control Act of 1944 was under consideration; although the House had already closed its hearings, the Senate Report proposed amending the bill to include provision for the Roanoke Basin, recommending "approval of the comprehensive plan and authorization for construction of the Buggs Island and Philpott Reservoirs in accordance with the recommendations of the Chief of Engineers." S. Rep. No. 1030, 78th Cong., 2d Sess. 8.

The proposal was accepted, and § 10 of the Act contains a corresponding provision. It provides that "the following works of improvement . . . are hereby adopted and authorized." Included in an omnibus listing of such "works of improvement" is the following: "The general plan for the comprehensive development" of the Roanoke Basin recommended in H. R. Doc. No. 650 "is approved" and construction of Buggs Island and Philpott is "hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in that report at an estimated cost of $36,140,000." [2]

---

[2] The full text of the provisions, so far as they are relevant, is as follows:

"SEC. 10. That the following works of improvement for the benefit of navigation and the control of destructive flood waters and other purposes are hereby adopted and authorized in the interest of the national security and with a view toward providing an adequate reservoir of useful and worthy public works for the post-war construction program, to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers in ac-

It is this statutory language that petitioners say withdrew the Roanoke Rapids site from the licensing jurisdiction of the Commission. They ask us to read the word "approved" as a reservation of the site for public construction and, by necessary implication, a withdrawal of the site from the Commission's licensing authority. A flat "approval" of a plan clearly recommending public construction as an indispensable constituent of the plan might indeed have that effect, but, as indicated above, we do not find that the plan made any such recommendation.

A separate argument of petitioners is based in part on the language of a proviso commonly inserted in authorizations for flood-control surveys,[3] that the Government shall not be deemed to have entered upon a project until the project is "adopted by law." From this language petitioners infer that the Government's entry upon a project so as to preclude private construction occurs when Congress adopts a project, and they ask us to say that such adoption occurred here when Congress "ap-

---

cordance with the plans in the respective reports hereinafter designated and subject to the conditions set forth therein: [Provisos omitted].

.        .        .        .        .

"ROANOKE RIVER BASIN

"The general plan for the comprehensive development of the Roanoke River Basin for flood control and other purposes recommended by the Chief of Engineers in House Document Numbered 650, Seventy-eighth Congress, second session, is approved and the construction of the Buggs Island Reservoir on the Roanoke River in Virginia and North Carolina, and the Philpott Reservoir on the Smith River in Virginia, are hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in that report at an estimated cost of $36,140,000." 58 Stat. 891–892, 894.

[3] See, e. g., § 6 of the Flood Control Act of 1936, quoted p. 158, *supra*.

proved" the plan comprehending the Roanoke Rapids site. We do not think the word "approval" carries the implication of "adoption" or "authorization" by its own force. Read together with other legislative action concerning water resources and with the history of federal activity in that regard, congressional "approval" without more [4] cannot be taken, we think, to indicate in this case more than a legislative finding that the proposed projects, no matter by whom they may be built, are desirable and consistent with congressional standards for the ordered development of the Nation's water resources. Such a finding has meaning in conveying the congressional purpose and expressing a congressional attitude. Concretely it means that Congress has adopted a basic policy for the systematic development of a river basin. Decision is made on such questions as the locations of projects, the purposes they are to serve, their approximate size and the desirable order of construction; because of the necessary interrelationship of many technical engineering and economic features of the several dams in a single river basin, early choice among possible alternatives is imperative. The policy chosen by Congress when it approves a plan is, in the first place, directed to Congress

---

[4] There is little force in the argument that the words "adopted and authorized" in § 10, see note 2, *supra*, apply to the Roanoke Rapids site. Not only is the specific provision as to the Roanoke Basin to control over the general, but that which is adopted and authorized is not "the following plans" but "the following works of improvement," which patently refers to such projects as Buggs Island and Philpott, rather than to all sites named in a comprehensive plan. This answers that part of petitioners' argument which relies on the language of § 10 speaking of prosecution of the projects "under the direction of the Secretary of War" when "budgetary requirements" permit. As a matter of language, apart from all other considerations, the "works of improvement" to which such language refers is better read as the projects authorized rather than as all projects named in plans that were approved.

itself in its appropriating function.[5]   Approval also tells the Federal Power Commission—the executant of congressional policy—how to exercise its authority in relation to the authorization of sites in the Roanoke Basin.   The finding had utility in this case in the guidance it gave the Commission in determining whether a private applicant would adequately develop all the benefits that should be derived from the proposed site.

In so interpreting the language Congress has used, we gain some light from the action Congress has taken to set projects in motion following enactment of statutes "approving" a comprehensive plan and "authorizing" certain projects set out in the plan.   For the Roanoke River Basin itself, although Buggs Island and Philpott were specifically "authorized" in the Flood Control Act of 1944, separate steps were taken by Congress to complete the authorization; "planning money" was appro-

---

[5] The Rules of both the Senate and the House in 1944, as now, called for previous choice of policy through authorization by law before any item of appropriations might be included in a general appropriations bill.   Rule XVI, Senate Manual, S. Doc. No. 239, 77th Cong., 2d Sess. 20; Rule XXI, Rules of the House of Representatives, H. R. Doc. No. 812, 77th Cong., 2d Sess. 384.   The importance of this distinction in the context of authorization of power projects is brought out in the following colloquy between a representative of the Corps of Engineers and Chairman Whittington of the House Committee on Public Works:

"The CHAIRMAN. . . . Is not the word 'approved' an authorization for the plan but without appropriation, or without an authorization for the appropriation?

"What is the difference between approving and authorizing a plan?

"Colonel GEE. We have never construed the approval of the plan to carry with it the authorization to construct the elements of that plan.

"The CHAIRMAN. Nor do we."   Hearings before the House Committee on Public Works on H. R. 5472 (Title II), 81st Cong., 1st Sess. 42.

priated, a "Definite Project Report" was received for Buggs Island, and then funds for construction of Buggs Island were appropriated. Equally illuminating is the procedure by which Congress recently set in motion plans to build a project "approved" exactly as was the Roanoke Rapids project. At approximately the same time as the engineering reports on the Roanoke River were submitted, a comparable report was submitted concerning the Savannah River, Georgia, and recommending a comprehensive plan much like the Roanoke River Basin plan. Like Buggs Island and Philpott in the Roanoke plan, Clark Hill in the Savannah plan was recommended for immediate authorization, "as the initial step." See H. R. Doc. No. 657, 78th Cong., 2d Sess. 6. As the demand for power increased, other projects included in the plan were to follow, the first to be the Hartwell site. The Senate Report accepted this recommendation, S. Rep. No. 1030, 78th Cong., 2d Sess. 9–10, just as it had the Roanoke Basin recommendation, and called for "approval of the comprehensive plan and authorization for construction of the Clark Hill project." *Id.*, at 10. Section 10 of the Flood Control Act of 1944 contains a corresponding provision. 58 Stat. 894. Thus, the background as well as the precise terms of the provisions relating to projects in the Savannah River plan are closely parallel to those relating to the Roanoke projects. Recently, when further construction on the Savannah River was proposed and authorization of Hartwell, the site next in line, was recommended, neither Congress nor the Engineers treated the earlier "approval" of the comprehensive plan as a final step making unnecessary other than automatic appropriations for Hartwell. Rather, hearings were held, see Hearings before House Committee on Public Works on H. R. 5472 (Title II), 81st Cong., 1st Sess. 37–85 (May 16, 1949), and a separate authorization for construction was

included in the Rivers and Harbors Act of 1950, 64 Stat. 171.[6]

Respondents further point out that at the same time hearings were held on the Hartwell project, there were also hearings on further construction in the Roanoke Basin, and the Corps of Engineers proposed the authorization of Smith Mountain, a project with minor flood-control benefits but not next in line under the plan as approved in the Flood Control Act of 1944. That plan had put the Roanoke Rapids site here involved and the Gaston site ahead of Smith Mountain. The reason given by the Engineers for changing the order of construction was that private applications, including the application here, had been made or contemplated for the Roanoke Rapids and Gaston sites. While we do not attach weight to subsequent statements by the Engineers that the Flood Control Act of 1944 did not preclude private construction of some projects in the plan, it is pertinent to note that a Committee of Congress responsible for water resources legislation was informed that an application was pending for private construction. Whether or not the Committee agreed that the Flood Control Act of 1944 allowed private construction of projects comprehended in plans there approved, in fact no action was taken by it to prevent the Commission from proceeding to hear the

---

[6] The general enacting provision, § 204, 64 Stat. 170, is substantially the same as § 10 of the Flood Control Act of 1944, *supra,* note 2. The specific provision as to the Savannah River is as follows:

"SAVANNAH RIVER BASIN

"There is hereby authorized to be appropriated the sum of $50,000,000 for the construction of the Hartwell project in the general plan for the comprehensive development of the Savannah River Basin, approved in the Act of December 22, 1944, in addition to the authorization for project construction in the Act of December 22, 1944." 64 Stat. 171.

VEPCO application, although the Committee learned that the application was pending over a year and a half before the order was handed down by the Commission.

Whatever light these subsequent proceedings in Congress afford, both as to the Roanoke Basin and as to the comparable Hartwell site in the Savannah River plan, we find no solid ground for concluding that Congress has taken over the entire river basin for public development with such definiteness and finality so as to warrant us in holding that Congress has withdrawn as to this whole river basin its general grant of continuing authority to the Federal Power Commission to act as the responsible agent in exercising the licensing power of Congress. Extensive review of the need for integration of federal activities affecting waterways, see, *e. g.,* Report of Secretary of War Stimson, H. R. Doc. No. 929, 62d Cong., 3d Sess. 32–35 (1912), and of the breadth of authority granted to the Commission by Congress in response to that need is hardly necessary to establish the role of the Commission in hydroelectric power development. See, *e. g., First Iowa Coop.* v. *Power Comm'n,* 328 U. S. 152, 180, 181, and cases cited. From the time that the importance of power sites was brought to public and congressional consciousness during the administration of President Theodore Roosevelt, the significant development has been the devising of a general power policy instead of *ad hoc* action by Congress, with all the difficulties and dangers of local pressures and logrolling to which such action gave rise. See the Veto Messages of Presidents Roosevelt and Taft, *e. g.,* 36 Cong. Rec. 3071 (Muscle Shoals, Ala., 1903); 42 Cong. Rec. 4698 (Rainy River, 1908); H. R. Doc. No. 1350, 60th Cong., 2d Sess. (James River, 1909); H. R. Doc. No. 899, 62d Cong., 2d sess. (White River, 1912); S. Doc. No. 949, 62d Cong., 2d Sess. (Coosa River, 1912). It soon became clear that indispensable to a wise national policy

was the creation of a commission with functions and powers comparable to those of the Interstate Commerce Commission in the field of transportation. It took the usual time for such a commission to come into being, and the process was step-by-step. Originally Congress entrusted its policy to a commission composed of three Cabinet officers. 41 Stat. 1063. An agency so burdened with other duties was naturally found inadequate as the instrument of these important water-power policies. And so, in 1930, the Commission was reorganized as an expert body of five full-time commissioners. 46 Stat. 797, 16 U. S. C. § 792. These enactments expressed general policies and granted broad administrative and investigative power, making the Commission the permanent disinterested expert agency of Congress to carry out these policies. Cf. 41 Stat. 1065, as amended, 49 Stat. 839, 16 U. S. C. § 797; 3 Report of the President's Water Resources Policy Comm'n 501 (1950).

A principal responsibility of the Commission has always been that of determining whether private construction is consistent with the public interest. See, e. g., S. Rep. No. 180, 66th Cong., 1st Sess. 3. Express provision is made to charge the Commission with the task of deciding whether construction ought to be undertaken by the United States itself. 41 Stat 1067, as amended, 49 Stat. 842, 16 U. S. C. § 800 (b). Further, even if private construction is to be allowed, approval of private applications requires a determination that the proposed project is "best adapted to a comprehensive plan" for water resources development. 41 Stat. 1068, as amended, 49 Stat. 842, 16 U. S. C. § 803 (a). Thus, congressional approval of a comprehensive plan can be read, as we think it should in this case, simply as saying that a plan such as that here, recommended by the Corps of Engineers for the fullest realization of the potential benefits in the river basin, should be accepted by the

Commission as the comprehensive plan to be used in the application of these statutory provisions. That "approval" as such does not reserve all projects in the plan for public construction is perhaps further indicated by the fact that when Congress has wished to reserve particular sites for public construction, it has chosen to say so. See 41 Stat. 1353, 45 Stat. 1012, 45 Stat. 1062.

Of course it is not for us to intimate a preference between private or public construction at this site. Nor are we even asked to review the propriety of the Commission's determination in this case that private construction is "in harmony with" the comprehensive plan for the Roanoke Basin. *Re Virginia Electric & Power Co.*, 87 P. U. R. (N. S.) 469, 483. We are simply asked to decide whether Congress has withdrawn the power to decide this question from the Commission. To conclude that Congress has done so by approving a general plan for development that may be, and in this case was, a plan for long-term development, would be to contract, by a tenuous chain of inferences, the broad standing powers of the Commission. Particularly relevant in this regard is the estimate that public development at this site would not in the normal course be undertaken for many years. See Examiner's Decision of March 17, 1950, R., I, 109. Congress was of course aware that, by granting a license to private enterprise, the Federal Power Commission would not commit the site permanently to private development and preclude all further congressional action. The Commission would, as it did here, simply express its judgment that, at the time, private development of the site was consistent with the general conception of the way in which the Roanoke River Basin should be developed. For, at any time short of the fifty years in which a site automatically becomes available to the Government without compensation, the Government may determine that the public interest makes it more desirable that the

project be operated publicly and has the right then, by appropriate steps, to take over the project. 41 Stat. 1071, as amended, 49 Stat. 844, 16 U. S. C. § 807. The purpose of Congress would have to be much more clearly manifested to justify us in inferring that Congress revoked the Commission's power to decide whether a private license consonant with the general scheme of development for this river basin ought now to be granted in the public interest.

Our conclusion is in accord with the implications of the manifest reluctance of Congress to enter upon power projects having no flood-control or navigational benefits. It cannot be said that as unclear a term as "approval" was to have settled, for this entire river basin, a major controversy that has arisen again and again in connection with legislation authorizing public construction of hydroelectric projects. The declaration of policy in the Flood Control Act of 1936, *supra,* pp. 157–158, puts strong emphasis on the flood-control aspects of plans for sites that would also produce power; no change in this policy can be read into § 10 of the Flood Control Act of 1944. Cf., *e. g.,* 90 Cong. Rec. 4126; *id.,* at 4127. And the sponsor in the House of the Flood Control Act of 1944 stated in answer to a question: ". . . we have repeatedly stated during the debate that no project, reservoir, or dam, or other improvement is embraced in this bill unless it is primarily for flood control. If power can be developed as an incident, or if reclamation can be provided, they are cared for in the bill." 90 Cong. Rec. 4199; cf. *id.,* at 4202. In the light of this history and these specific declarations, it strains belief that "approval" of the comprehensive plan for the Roanoke Basin reserves all projects named in the plan for federal construction when the two projects that provided the chief flood-control features of the plan were the only ones specifically authorized.

Subordinate arguments are made, bearing partly on the power of the Commission to issue any license for private development and partly on the Commission's exercise of its power in granting this license. The arguments involve technical engineering and economic details which it would serve no useful purpose to canvass here. Once recognizing, as we do, that the Commission was not deprived of its power to entertain this application for a license, we cannot say, within the limited scope of review open to us, that the Commission's findings were not warranted. Judgment upon these conflicting engineering and economic issues is precisely that which the Commission exists to determine, so long as it cannot be said, as it cannot, that the judgment which it exercised had no basis in evidence and so was devoid of reason.

At the heart of these arguments is the fact that the Roanoke Rapids site is, under present estimates, the most desirable site for power in the Roanoke Basin. For that reason, as petitioners argue, removal of the Roanoke Rapids site from a government-operated system would result in loss to the Federal Government of the potential benefits of that site and a decrease, but only by the amount of the Roanoke Rapids profits, in the potential profits of the system as a whole. But it has never been suggested that such is the criterion under which the Commission is to determine whether a project ought to be undertaken by the United States, let alone that such considerations could demonstrate that Congress withdrew the Roanoke Rapids site from the licensing jurisdiction of the Commission. If it could be shown that the plan could not be executed successfully without the Roanoke Rapids site, it would be arguable that congressional approval of the plan presupposed that all units of the plan be centrally administered. The findings are to the contrary. The Commission has found that the proposed pri-

vate project is consistent with the plan contained in the Flood Control Act of 1944, *Re Virginia Electric & Power Co., supra,* at 483; that there is no reason to believe that the "interest of the public at large will not be fully protected and promoted" by the issuance of this license, *id.,* at 472; and that there was no showing that the Roanoke Rapids site would "at any time" be developed by the United States. *Id.,* at 483. Further, there is express recognition of the possibility that the site may be benefited by government projects in operation and consequently of the fact that VEPCO may be required to compensate the Government for any such "headwater benefits" conferred.[7] *Id.,* at 477–478.

Finally, we do not find merit in the contention that the Commission was required by § 7 (b) of the Federal Power Act to recommend public construction of the project.[8] As the report of the Corps of Engineers does not

---

[7] Thus, whatever benefits may be conferred by such government projects as Buggs Island on the Roanoke Rapids site will not be lost to the United States. The Commission is required by § 10 (f) of the Federal Power Act, 41 Stat. 1070, as amended, 49 Stat. 843, 16 U. S. C. § 803 (f), to determine the charges to be paid by the licensee. The parties are in dispute over the value of the benefits, but, as the Commission said, "[t]he amount of the payments for headwater benefits due under the Federal Power Act cannot be estimated with any degree of accuracy until after the project has been placed in operation for such time as necessary to demonstrate what actual benefits are being conferred." *Re Virginia Electric & Power Co., supra,* at 478. We do not consider the correct basis for ascertaining the amount due to the United States, because, as the Commission's statement indicates, the question is not before us in this case.

[8] Section 7 (b) of the Federal Power Act provides:

"Whenever, in the judgment of the Commission, the development of any water resources for public purposes should be undertaken by the United States itself, the Commission shall not approve any application for any project affecting such development, but shall

clearly recommend that all projects be constructed by the United States, the Commission's concurrence in that report cannot provide a basis for invoking the provisions of § 7 (b). Section 7 (b) is a direction to the Commission not to approve a private application for a project "affecting" any development of water resources which, in the judgment of the Commission, should be undertaken by the United States itself. Petitioners in effect ask us to tell the Commission what it thought—to say to the Commission that it was its judgment that Roanoke Rapids, as well as all the other seven projects in the Roanoke plan not yet under consideration, should be built by the Government. It is not clear that the Commission's concurrence in the general plan would have been much more than simple approval of the location of the dams, the purposes they would serve, and the engineering characteristics of the projects, even if the report had clearly recommended public construction. Primary responsibility for the enforcement of the provisions of § 7 (b) must remain with the Commission; we cannot infer a judgment of the Commission that it never expressed and now specifically disavows.

For these reasons, we agree with the Court of Appeals that the Commission's order must stand. In the bits and pieces of legislative history which we have set out, we find no justification for inferring that Congress withdrew the Commission's authority regarding the Roanoke River Basin from the general authority given the Commission to grant licenses for private construction of hydroelectric projects with appropriate safeguards of the public interest. Whatever the merits of the controversy

cause to be made such examinations, surveys, reports, plans, and estimates of the cost of the proposed development as it may find necessary, and shall submit its findings to Congress with such recommendations as it may find appropriate concerning such development."

as to which agency—the Government or a private party—
should construct this project, that question is not within
our province.

*Affirmed.*

Mr. Justice Clark, concurring.

I agree with the majority that the sole question before
us is whether Congress has withdrawn the Roanoke
Rapids site from the licensing jurisdiction of the Com-
mission and that the answer is in the negative. But in
reaching this result weight should be given the adminis-
trative interpretation of the 1944 Flood Control Act both
by the Army Corps of Engineers and the Federal Power
Commission. Taken together with the fact that Con-
gress was fully advised of the Commission's action and
the Corps' agreement with it as early as May 1949 and
failed to express any disagreement during the period of
more than two years when the application was under
consideration, this administrative interpretation seems
to me decisive.

We are cited to three cases in which the Commis-
sion, with the full approval of the Corps of Engi-
neers, has licensed private developments despite prior
congressional action adopting and authorizing public
construction as part of river basin improvement plans.[1]
While the plans included in those projects may not have

---

[1] License issued to County of Placer, California, August 8, 1951.
Project No. 2021, for power plant at debris storage dam on North
Fork, American River, constructed pursuant to authorization in
River and Harbor Act of August 30, 1935 (49 Stat. 1028, 1038), as
recommended in House Rivers and Harbors Committee Document
No. 50, 74th Cong., 1st Sess. License issued to St. Anthony's Falls
Water Power Co., August 31, 1951, Project No. 2056, to use water
from United States navigation dam at St. Anthony's Falls, Minne-
sota, authorized in the River and Harbor Act of 1937 (50 Stat. 844,
848); as recommended in House Rivers and Harbors Committee

been as comprehensive as The Roanoke River Basin Plan, each had been approved by Acts of Congress using language similar to that in § 10 of the Flood Control Act of 1944. With this as background, a colloquy between Colonel Gee of the Corps of Engineers and the House Flood Control Committee on May 16, 1949, gains significance. Colonel Gee mentioned VEPCO's then pending application and stated that the Corps had not regarded the 1944 approval as precluding such private licensing.[2] I would affirm on the basis of this administrative interpretation by two agencies charged by Congress with direct flood control and power licensing responsibilities.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

Roanoke Rapids is a power site belonging to the Federal Government and now surrendered to private power interests under circumstances that demand a dissent.

Roanoke Rapids is a part of the *public domain*.

---

Document No. 34, 75th Cong., 1st Sess. Two licenses issued in 1934 and 1936 to Kanawha Valley Power Co., Projects Nos. 1175 and 1290, for three power plants at navigation dams on Kanawha River, West Virginia, authorized in River and Harbor Act of 1930 (46 Stat. 918, 928) as recommended in H. R. Doc. No. 190, 70th Cong., 1st Sess.

[2] "MR. ANGELL. Is the Federal Government at the present time planning to develop any of those dams on the lower part of the river which are devoted exclusively to power production?

"COLONEL GEE. No, sir. They have the same status in this basin plan as the eight remaining projects. They are part of the approved plan. Their being in that plan certainly is no bar to a private utility company coming in and seeking to develop one of these projects.

"MR. ANGELL. And that is what is being done now.

"COLONEL GEE. That is being done now at Roanoke Rapids, sir." Hearings before the House Committee on Public Works on H. R. 5472 (Tit. II), 81st Cong., 1st Sess. 144.

(1) The Roanoke is a navigable stream over which Congress has complete control for purposes of navigation, flood control, watershed development, and the generation of electric power. *United States* v. *Appalachian Power Co.,* 311 U. S. 377, 426; *Oklahoma* v. *Atkinson Co.,* 313 U. S. 508, 525.

(2) The water power inherent in the flow of a navigable stream belongs to the Federal Government. *United States* v. *Appalachian Power Co., supra,* at 424.

(3) The dam sites on this navigable stream are public property. The technical title to the bed of the stream may be in private hands. But those private interests have no compensable interest as against the control of the Federal Government. *United States* v. *Chicago, M., St. P. & P. R. Co.,* 312 U. S. 592, 596–597; *United States* v. *Commodore Park,* 324 U. S. 386, 390.

This is familiar law that emphasizes the *public* nature of the project which the Court now allows to be used for the aggrandizement of private power interests. This project is as much in the public domain as any of our national forests or national parks. It deals with assets belonging to all the people.

These facts must be kept in mind in reading § 10 of the Flood Control Act of 1944, 58 Stat. 887, 891.[1] From that

---

[1] Section 10 of the Flood Control Act of 1944 reads in pertinent part as follows: "That the following works of improvement for the benefit of navigation and the control of destructive flood waters and other purposes are hereby adopted and authorized in the interest of the national security and with a view toward providing an adequate reservoir of useful and worthy public works for the post-war construction program, to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers in accordance with the plans in the respective reports hereinafter designated and subject to the conditions set forth therein: *Provided,* That the necessary plans, specifications, and preliminary work may be prosecuted on any project authorized in this Act to be constructed by the War Department during the war, with funds from appropriations

starting point I think it only fair to conclude (1) that if Congress undertook to remove this project from the *public domain,* it would make its purpose plain; and (2) that when Congress approved the project it meant to reserve it for the public good, not to make it available to private interests to exploit for their own profit.

Section 10 "adopted and authorized" the development of the Roanoke River Basin "in the interest of the national security and with a view toward providing an adequate reservoir of useful and worthy public works for the post-war construction program." The words "public works" certainly connote *public* not private construction.

Section 10 further provided that the projects which are "adopted and authorized" are "to be prosecuted under

heretofore or hereafter made for flood control, so as to be ready for rapid inauguration of a post-war program of construction: *Provided further,* That when the existing critical situation with respect to materials, equipment, and manpower no longer exists, and in any event not later than immediately following the cessation of hostilities in the present war, the projects herein shall be initiated as expeditiously and prosecuted as vigorously as may be consistent with budgetary requirements: *And provided further,* That penstocks and other similar facilities adapted to possible future use in the development of hydroelectric power shall be installed in any dam authorized in this Act for construction by the War Department when approved by the Secretary of War on the recommendation of the Chief of Engineers and the Federal Power Commission.

.       .       .       .       .

"ROANOKE RIVER BASIN

"The general plan for the comprehensive development of the Roanoke River Basin for flood control and other purposes recommended by the Chief of Engineers in House Document Numbered 650, Seventy-eighth Congress, second session, is approved and the construction of the Buggs Island Reservoir on the Roanoke River in Virginia and North Carolina, and the Philpott Reservoir on the Smith River in Virginia, are hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in that report at an estimated cost of $36,140,000."

the direction of the Secretary of War and supervision of the Chief of Engineers." That language also suggests *public* projects, not private undertakings.

Section 10 also provided that these projects "shall be initiated as expeditiously and prosecuted as vigorously as may be consistent with budgetary requirements." Plainly Congress was concerned with the "budgetary requirements" of the Federal Government, not with the budgetary requirements of private power companies. Section 10, after approving the general plan for the comprehensive development of the Roanoke River Basin, authorizes the construction of the Buggs Island Reservoir on the Roanoke River and the Philpott Reservoir on the Smith River.

This Act, passed before the end of World War II, was designed to serve a post-war need. It was drawn so as to provide a backlog of public works projects which would take up the slack of unemployment expected at the war's end. Congressman Whittington, in charge of the bill in the House, made the following significant statement concerning this objective, 90 Cong. Rec. 4122:

> "We recall the depression following World War No. 1. We are apprehensive of another debacle following the present war. It is difficult to arm. It is more difficult to disarm. Post-war unemployment will be a major national problem. While we are defending our freedom and our way of life, we must not fail to take stock of the problem of unemployment which we must face when the war is over.
>
> "We must profit by the experience of 1920. We must profit by the experience of 1930. A reservoir of projects must be adopted. Backlogs should be provided and they should be real backlogs. Many wasteful and extravagant activities to provide employment were adopted in 1933. Haste and speed

were imperative. There was hunger in the land. Unemployment was widespread. There must be no repetition of waste and extravagance. There are Federal activities and there are public works that will promote the general welfare."

This statement highlights the meaning of "public works" as used in § 10; it discloses an important reason for lodging the program with public officials; it emphasizes the occasion for referring to the budgetary requirements of the Federal Government and the importance of linking flood control with post-war unemployment problems.

The argument that when Congress by § 10 of the Act "adopted and authorized" the "following works of improvement," it "adopted and authorized" *only* the Buggs Island and Philpott reservoirs involves an invented distinction between "works of improvement" and "general plans for development"—a distinction without any rational basis. The "works of improvement" which are "adopted and authorized" by § 10 are 38 in number. Some of these are described in the sub-headings as "projects" that are "authorized," some as "plans of improvement" that are "approved" and "authorized," some as "general plans" for the comprehensive development of river basins that are "approved" together with the "construction" of specific projects that are "authorized." This makes plain that "works of improvement" which are "adopted and authorized" by § 10 include a variety of undertakings, not merely works of construction which are first steps in general comprehensive plans being adopted and authorized.

From this it seems almost too plain for argument that Congress, in approving the plan for the development of the Roanoke River Basin, was setting it aside for federal development, the several public works projects under the plan to be authorized as, if, and when conditions war-

ranted them and budgetary requirements permitted.[2]  In this setting "approval" by Congress meant a dedication of the projects for public development.[3]

If that view is not taken, then why did Congress call these projects "public works"?  If these projects were destined for development by private power interests, why did Congress place their construction under the Secretary of War and the Chief of Engineers?  If Congress left this part of the public domain for exploitation by private power groups, why did it gear them to the employment requirements of the post-war period and the budget requirements of the Federal Government?  Approval of the projects by Congress under these various terms and conditions can only mean one thing—that Congress gave its sanction to their development as public projects.

To be sure, Congress in the Federal Power Act left part of the public domain to be exploited by private interests, if the Federal Power Commission so orders.  But the action relative to the Roanoke River Basin was action by Congress without reference to the Federal Power Com-

---

[2] Congressman Curtis, one of the House conferees, explained the same language in § 9 of the Act whereby Congress "approved" comprehensive plans for the development of the Missouri River Basin (90 Cong. Rec. 9284):

"It means that Congress has approved the general plans of the engineers, and it means that these plans are authorized by law and are, therefore, eligible for future appropriations.  Without such an authorization, no appropriation can be had."

[3] The interpretations placed on the Act by the Army Corps of Engineers are entitled to no weight.  The Corps of Engineers is not an administrative agency charged with the responsibility of deciding issues of policy.  Its powers are limited to the making of investigations and the preparation and submission of recommendations and reports based on engineering considerations.  See, for example, § 1 (a) of the Act of December 22, 1944, 58 Stat. 887, adopting and authorizing the Roanoke River Basin plan; 33 U. S. C. § 701–1 (a).  Congress alone makes policy decisions affecting the public domain.

mission. Its action was not made dependent on the approval of the Federal Power Commission. The Act in no way links the Roanoke River Basin program to the Commission. To the contrary, the Congress undertook to authorize specific projects under the plan, plainly suggesting that these were *public* projects whose authorization was in no way dependent on Commission action.

The true character of this raid on the *public domain* is seen when Roanoke Rapids is viewed in relation to the other projects in the comprehensive plan. Roanoke Rapids is the farthest downstream of the 11 units in the plan. Upstream from Roanoke Rapids is Buggs Island (now under construction with federal funds) with an ultimate installed capacity of 204,000 kw. and a controlled reservoir capacity of over 2,500,000 acre-feet. Roanoke Rapids is indeed the powerhouse of the Buggs Island Reservoir. That reservoir increases the dependable capacity of Roanoke Rapids from 4 hours during the peak month of December to 288 hours in the same peak month. Buggs Island contributes 70,000,000 kw.-hr. to the Roanoke Rapids project. This is on-peak energy, firm energy made dependable by the storage in the Buggs Island Reservoir. There is evidence that this energy will have a value in excess of $700,000 a year.[4]

That $700,000 of value is created by the taxpayers of this country. Though it derives from the investment of federal funds, it will now be appropriated by private power groups for their own benefit. The master plan now becomes clear: the Federal Government will put up the auxiliary units—the unprofitable ones; and the private power interests will take the plums—the choice ones.

[4] Even the evidence submitted by the private power company applicant belies the Commission's figure of $250,000 (see 87 P. U. R. (N. S.) 469, 477–478) and places the value in excess of $700,000. The Commission's figure of $250,000 is indubitably a plain error.

There is not a word in the Act which allows such an unconscionable appropriation of the *public domain* by private interests. To infer that Congress sanctioned such a scheme is to assume it was utterly reckless with the *public domain*. I would assume that Congress was a faithful trustee, that what it approved as "public works" projects it dedicated to the good of all the people.