NATIONAL HELLS CANYON ASSOCIATION, Inc., et al., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Idaho Power Company, Intervenor.

Nos. 12988, 13160.

United States Court of Appeals District of Columbia Circuit.

Argued May 15, 1956.

Decided Oct. 9, 1956.

Petition for Rehearing In Banc Denied Nov. 16, 1956.

Mrs. Evelyn N. Cooper and Mr. Lucien Hilmer, Washington, D. C., for petitioners.

Mr. John C. Mason, Asst. Gen. Counsel, Federal Power Commission, with whom Messrs. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, and Joseph B. Hobbs, Atty., Federal Power Commission, were on the brief, for respondent.

Mr. R. P. Parry, Twin Falls, Idaho, with whom Messrs. Clifford E. Fix, Twin Falls, Idaho, and A. C. Inman, Boise, Idaho, were on the brief, for intervenor.

Before WILBUR K. MILLER, WASHINGTON and DANAHER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

These petitions for review, which were consolidated for hearing and decision, attack two orders of the Federal Power Commission. The first and more important of the orders,[1] issued August 4, 1955, granted to Idaho Power Company a license to construct, maintain and operate on the Hells Canyon reach of the Snake River in Idaho and Oregon, which extends approximately 100 miles downstream from Weiser, Idaho, three water power developments known as Brownlee, Oxbow and low Hells Canyon.

The petitioners for review are eight Public Utility Districts of certain counties in Washington, the National Rural Electric Cooperative Association and National Hells Canyon Association, Inc.[2] They were not themselves applicants for the license but intervened in the proceeding before the Commission and opposed the grant to Idaho Power Compa-

1. The second order, issued November 3, 1955, merely approved revised exhibits showing the basic project designs for the three-dam proposal, which were filed by the Power Company pursuant to a requirement of the licensing order. Our ruling on the licensing order will govern this one also.

2. The latter was organized in 1953 by certain farm and labor organizations, public power associations and rural electric cooperatives, for the purpose of opposing Idaho Power's application and advocating federal development instead.

ny [3] on the ground that it was the duty of the Commission under § 7(b) of the Federal Power Act to decide that the United States itself should undertake the development and to recommend that Congress provide for governmental construction of a single high dam in Hells Canyon, such as had been suggested several years before by the Army Corps of Engineers and by the Reclamation Bureau of the Department of the Interior; and on the further ground that the three-dam plan proposed by Idaho Power was not, within the meaning of § 10(a) of the Act, "best adapted to a comprehensive plan" for developing the water resources of the Hells Canyon reach for public purposes.

Having failed to persuade the Federal Power Commission to adopt their views, the petitioners ask us to set aside the grant to Idaho Power Company because, as they say, the Commission arbitrarily violated § 7(b) of the Federal Power Act [4] by failing and refusing (a) to conclude that the development of the water resources involved should be undertaken by the United States, and (b) to "cause to be made such examinations, surveys, reports, plans, and estimates of the cost of the proposed development as it may find necessary," and to "submit its findings to Congress with such recommendations as it may find appropriate concerning such development." The petitioners contend not only that the Commission had no choice but to decide for federal development, but also that it was bound to recommend that it be accomplished by the construction of the one high dam which had been suggested by the other two federal agencies. Had the Commission's judgment been that the Government should undertake the development —as the petitioners say it should have been—it would have been required by § 7(b) to withhold approval of Idaho Power's applications.

Petitioners further assail the grant to Idaho Power on the ground that in making it the Commission arbitrarily violated § 10(a) of the Act [5] in finding the applicant's three-dam proposal to be "best adapted to a comprehensive plan" for developing the water resources of the Hells Canyon reach for public purposes. The suggested federal high dam is "best adapted," they say, for those purposes.

We observe that the admonitions to the Commission contained in § 7(b) become effective only when "in the judgment of the Commission" the development should be undertaken by the Government. In like manner, § 10(a) provides that any license issued shall be on condition that the project adopted shall be such as "in the judgment of the Commission" will be best adapted to a comprehensive plan for developing the water resources for beneficial public uses. The recurrence of the quoted phrase emphasizes the broad discretion as to these technical matters which Congress has committed to the

---

3. The State of Washington intervened and actively opposed the recommendation of a governmental high dam.

4. Section 7(b) of the Act—41 Stat. 1067, as amended 49 Stat. 842, 16 U.S.C.A. § 800 (b)—is as follows:

"(b) Whenever, in the judgment of the Commission, the development of any water resources for public purposes should be undertaken by the United States itself, the Commission shall not approve any application for any project affecting such development, but shall cause to be made such examinations, surveys, reports, plans, and estimates of the cost of the proposed development as it may find necessary, and shall submit its findings to Congress, with such recommendations as it may find appropriate concerning such development."

5. Section 10(a) of the Act—41 Stat. 1068, as amended, 49 Stat. 842, 16 U.S.C.A. § 803(a)—provides:

"(a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval."

Commission. "Judgment upon these conflicting engineering and economic issues is precisely that which the Commission exists to determine," said the Supreme Court in the Roanoke Rapids case,[6] "so long as it cannot be said * * that the judgment which it exercised had no basis in evidence and so was devoid of reason."

Accordingly, our review of the Commission's orders in these cases is quite limited in scope. When we have determined whether the agency violated constitutional or statutory provisions, and whether its decision had a substantial basis in the evidence considered in its entirety, we are done.

Although Idaho Power Company was the only applicant for a license to develop the water resources of the Hells Canyon reach, the Commission conducted what was in effect an adversary hearing for the purpose of comparing the privately proposed three-dam plan with the single high dam installation which had been suggested. The hearing lasted a year or more. Many experts testified as to the engineering and economic aspects of the two plans and a great mass of proof was received. A comprehensive, carefully considered proposed decision was filed by the presiding examiner, after which the Commission handed down a lengthy opinion which contained more than fifty greatly detailed findings of fact upon which the ultimate decision to grant the license was based.

The Commission found that the three dams—Brownlee, Oxbow and low Hells Canyon—will develop the 602 feet of head in the Snake River's Hells Canyon reach. Brownlee will have a maximum head of 277 feet, usable storage of 1,000,000 acre-feet, and an initial installation of 360,400 kilowatts with provision for an additional 180,200 kilowatts. Oxbow will have a head of 117 feet, usable pondage of 6,200 acre-feet, and an initial installation of 151,000 kilowatts with provision for an additional 75,500 kilowatts. Low Hells Canyon will have a head of 208 feet, usable pondage of 11,200 acre-feet, and an initial installation of 272,000 kilowatts with provision for an additional 136,000 kilowatts.

The high concrete arch dam suggested for federal construction also would develop the 602 feet of head. There would be eight 100,000-kilowatt generating units initially with provision for one additional 100,000-kilowatt generating unit, a total storage capacity of 4,400,000 acre-feet of which 3,880,000 acre-feet would be active storage, a spillway with a capacity of 300,000 cubic feet per second, and an operating head at the power plant varying from a maximum head of 602 feet to a design head of 475 feet and thence to a minimum head of 313 feet.

The Commission received evidence as to the cost of both plans. Estimates of the cost of such large installations are of course elaborate and complicated. It is sufficient for present purposes to summarize by saying the three-dam development will probably cost about $175,000,000, while the high dam suggestion would probably run to something more than twice that sum.

In order to decide, as required by § 7 (b), whether, in its judgment, the development should be undertaken by the United States, the Commission compared the evidence as to the public purposes which would be achieved by the three-dam installation privately proposed, and by the suggested federal high dam advocated by the petitioners. It concluded that "the public purposes such as flood control, navigation and recreation could be effectuated to about the same extent under either plan of development." This left for consideration and comparison the production of power.

The Commission regarded it as essential, in deciding between the two plans as to power production, to compare the economics of the proposals, since power benefits constitute about 85 per cent of the total benefits to be derived under either plan. It therefore made the

6. United States ex rel. Chapman v. Federal Power Commission, 1953, 345 U.S. 153, 171, 73 S.Ct. 609, 619, 97 L.Ed. 918.

comparison, discussed it at some length in its opinion, and reached this conclusion:

"After full consideration of the comparative economics of the power features of the one-dam and the three-dam plans as presented by the evidence of record and as analyzed in the several briefs filed herein we conclude that, assuming financing, construction and operation of both plans by the same entity, the ratio of power benefits to power costs of the three-dam plan is greater than that for the one-dam plan, and although the high Hells Canyon Project would produce a greater amount of power than the three-dam plan, the additional amount of power that could be produced by the high Hells Canyon Project would have a benefit-cost ratio of about one to one. Consequently the power features of the one-dam plan have no clear economic advantage over those of the three-dam plan."

It is contended the Commission erred in comparing, for § 7(b) purposes, the two plans as though they were to be undertaken by the same entity. It is insisted that the two proposals should be compared on the basis of private construction of the three-dam installation and federal construction of the one high dam, from which it would follow that the power from the latter could be marketed at a much lower cost due to the Government's superior credit and its freedom from taxation. If this were the criterion under § 7(b), federal development would invariably be preferable and the Commission's authority to issue licenses to private applicants could never be exercised without first recommending the proposals for federal construction and waiting to see whether Congress would authorize the work. This would seem contrary to legislative intent, as § 7(b) requires the Commission to recommend federal development only when *"in the judgment of the Commission"* the work should be undertaken by the United States itself. The italicized phrase is read out of the statute if the Commission must recommend every development for federal construction simply because the United States has better credit than any private applicant and is free from taxation.

Finally, the Commission's opinion announced that "it is our judgment that the United States itself should not undertake the development of the water resources of the Hells Canyon reach of the Snake River for public purposes." From the foregoing, it appears the judgment was reached by comparing the physical aspects and results of the two plans, with reliance also on economic features.

Another consideration influenced the decision of the Commission: the little likelihood that federal development would be authorized in the foreseeable future. "Particularly relevant in this regard", said the Supreme Court in the Roanoke Rapids case,[7] "is the estimate that public development at this site would not in the normal course be undertaken for many years."

That this was the case was apparent to the Commission from the legislative history of the suggested federal high dam. In February, 1950, the Army and the Interior Department submitted to Congress their suggestions for federal development of water resources in the Columbia and its tributaries, including the Hells Canyon high dam on the Snake River. The suggestions were in such great detail as to fill ten volumes, and included financial studies, maps, plans and drawings. Following these filings, several bills to authorize Hells Canyon and other projects were introduced in the 81st Congress. During debate in April, 1950, amendments to authorize a federal dam at Hells Canyon, alone and in combination with other projects, were tabled. In the 82nd, 83rd and 84th Congresses the high dam proposal was pressed upon Congress but met a

---

7. United States ex rel. Chapman v. Federal Power Commission, 345 U.S. at page 169, 73 S.Ct. at page 618.

similar fate. Although the legislators have been aware of the fact that Idaho Power Company had applied to the Commission for a license to develop the Hells Canyon water resources, they have consistently refused to approve, adopt or authorize federal construction of the suggested high dam or any other projects, and so have not preempted the Hells Canyon reach of the river for governmental development.[8]

The thoughtful comments of the trial examiner on this subject seem particularly apt:

"Some of the interveners in this matter seemingly have the idea that all that would be needed to assure the authorization and appropriation for the High Dam Project by Congress would be for the Commission to reject the applications herein in their entirety and take appropriate action under Section 7(b). While the Congress might be expected to give consideration to such a recommendation, it is doubtful in the circumstances—where Congress has been giving consideration to development of the Middle Snake River for a number of years—that any expression by this Commission on the subject would have any appreciable effect.

"I conclude that, on the basis of facts before me, including the legislative history of the various Hells Canyon bills which have been heretofore presented to the Congress without success, the likelihood of the authorization of and appropriation for an undertaking of the size involved in the High Dam Project is so remote as to make a recommendation to Congress under Section 7(b) that such a dam be undertaken by the United States a completely useless action. Such action, which in

these circumstances could not be expected to produce more results than any of the bills which have been introduced and sponsored in the past by the Secretary of the Interior and various energetic legislators, would serve only to freeze the Middle Snake River for hydroelectric development for an indeterminate period in the future. Just as the Examiner and Commission in the Roanoke Rapids case were convinced of the need to harness the waters of the Roanoke River at earliest practicable date, I am convinced that the non-utilization of water resources could be in some circumstances just as short-sighted as less than maximum development. Keeping the consumer in mind—if the denial of all of the applications herein would have only the practical result of driving the Idaho Power Company to a steam-electric program at a much higher cost and with resultant increases in rates for power—I am doubtful that such action would be in the public interest. Only if such denial were to pave the way for lower cost power for those consumers would I believe such a denial would be in the public interest. I do not feel that it would be in the public interest for the Commission to take any steps the practical effect of which would be to delay indefinitely the use of these waters for power purposes and for the other purposes that would be served by the development of the water resources."

In sum, the Commission concluded that neither plan was more comprehensive than the other in the public purposes to be served; and that the fact that the single high dam would produce these public benefits in somewhat greater quantity than would the private proposal did

8. Section 14 of the Federal Power Act, 16 U.S.C.A. § 807, protects the public interest, in case Congress hereafter decides it is desirable for the Government to own and operate Idaho Power's installations, by providing

"* * * That the right of the United States * * * to take over, maintain, and operate any project licensed under this Act at any time by condemnation proceedings upon payment of just compensation is hereby expressly reserved."

not justify the formation of a judgment that the United States should undertake the former, in view of its greater cost and the improbability of its early authorization. Thus the Commission chose between a $400,000,000-plan, which nobody was offering to undertake, and another comprehensive development for which private capital in the sum of $175,-000,000 is immediately available, so construction can begin at once. In fact it is probable that construction has already begun, as the Supreme Court within recent weeks denied our petitioners' application for a stay pending judicial review.

In the circumstances which appear here, we think it appropriate to adopt the language of the Supreme Court in the Roanoke Rapids case:[9]

"   *   *   *   [W]e do not find merit in the contention that the Commission was required by § 7(b) of the Federal Power Act to recommend public construction of the project.   *   *   *   Petitioners in effect ask us to tell the Commission what it thought—to say to the Commission that it was its judgment that [Hells Canyon]   *   *   *   should be built by the Government.   *   *   *   Primary responsibility for the enforcement of the provisions of § 7(b) must remain with the Commission; we cannot infer a judgment of the Commission that it never expressed and now specifically disavows."

■ Having decided not to recommend Government construction of the expensive high dam, the Commission carefully considered the Idaho Power three-dam proposal and found as a fact that, within the meaning of § 10(a), it is "best adapted to a comprehensive plan for improving or developing a waterway   *   * for the use or benefit of interstate or foreign commerce; for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes". This finding is attacked by the petitioners, as

we have said. Though the Commission, under § 7(b), had rejected the suggested federal high dam, they insist it should be considered under § 10(a) as "best adapted to a comprehensive plan" etc. They say, "The Commission unlawfully disregards the Main Control Plan of the Federal comprehensive plan as the standard of judgment under § 10(a)." Thus they seem to regard the high dam suggestion as a federally adopted comprehensive plan which binds the Commission to hold it is "best adapted" for the purposes of § 10(a), although as we have seen it has not been authorized, adopted or even approved by Congress after more than six years of consideration.

The petitioners speak of the statutory word "comprehensive" as being a superlative and argue that the high dam suggestion must be considered *the* "comprehensive" plan because it would produce public benefits in greater measure albeit at tremendously greater cost. The word "comprehensive" is not superlative in significance. We have already seen that the three-dam proposal and the single high dam suggestion are equally comprehensive as to the achievement of public purposes.

But aside from that, we seriously doubt whether § 10(a), which attaches conditions to the issuance of a license under § 4(e), was intended by Congress to require the Commission to compare a suggested but rejected federal plan with pending private proposals, to see which is "best adapted to a comprehensive plan" of development. Such a comparison is made under § 7(b) when the Commission decides whether in its judgment the United States should undertake the construction and in doing so of course employs standards which include those set out in § 10(a). The Act must be read and applied as a whole.

We have seen that § 10(a) has to do with licenses issued under § 4(e) and prescribes conditions to which they must be subject. It comes into play only after the Commission has decided against fed-

9.   United States ex rel. Chapman v. Federal Power Commission, 345 U.S. at pages 172–173, 73 S.Ct. at page 620.

eral construction and so has turned to the consideration of applications for licenses therefor under § 4(e). We do not agree that a suggested plan of federal development, which has been rejected by the Commission under § 7(b), must be used by it as the standard of judgment under § 10(a).

The purpose of that section is to insure that a private proposal be not licensed unless it is "best adapted" etc. The word "best" is of course superlative and suggests comparison of two or more applications for licenses under § 4(e). But when, as here, the suggested federal development has been rejected and there is only one private proposal for consideration, § 10(a) can only mean that it shall not be licensed unless it is found, in the judgment of the Commission, to be well adapted to a comprehensive plan for the development of the water resources.

If it should still be argued, however, that in forming its judgment under § 10(a) the Commission must reject a private proposal which is presently available and which is well adapted to a comprehensive plan merely because a suggested federal plan, which it has already justifiably refused to recommend, is said to be better adapted to a comprehensive plan, the considerations which moved its § 7(b) decision again become important. In that event, the practical economic aspects of the two plans and the prospect of immediate construction become large factors in the process of deciding which is "better adapted." Again, we cannot substitute our judgment for that of the Commission concerning the technical questions which were before it.

The Commission did not act hastily in this matter. Idaho Power's first application was filed in 1950 and the others in 1953. And it was not until 1955 that the project was licensed, after the mature consideration we have described. We are not willing to accept the petitioners' characterization of the Commission's action as "administrative law-lessness." On the record before us, it may be the Commission could properly have concluded that the high dam project was appropriate for federal development. But the decision was for the Commission, not for us. Our task is to say whether the Commission was under a duty, in applying the law to the facts of record, to reach that conclusion instead of the one it did reach. Clearly we cannot so hold.

Other contentions of the petitioners, such as that the licensing order violates § 13 of the Act, which limits to four years the time within which licensed construction must be completed, have been considered but are regarded as insubstantial. We find no instance in which the Commission went beyond the confines of the Constitution or the governing statute; and we think that on the whole record "it cannot be said * * * that the judgment which it exercised had no basis in evidence and so was devoid of reason."[10]

Affirmed.

---

10. United States ex rel. Chapman v. Federal Power Commission, 345 U.S. at page 171, 73 S.Ct. at page 619.