**WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Petitioner,**

**v.**

**FEDERAL POWER COMMISSION, Respondent,**

Pacific Northwest Power Company, Idaho Wildlife Federation, Idaho Public Utilities Commission, Idaho Fish and Game Commission, Washington State Sportsmen's Council, Inc., et al., State of Oregon, et al., Intervenors.

**DEPARTMENT OF CONSERVATION, STATE OF WASHINGTON, Petitioner,**

**v.**

**FEDERAL POWER COMMISSION, Respondent,**

Pacific Northwest Power Company, Idaho Wildlife Federation, Idaho Public Utilities Commission, Idaho Fish and Game Commission, Washington State Sportsmen's Council, Inc., et al., State of Oregan, et al., Intervenors.

**UNITED STATES of America on the relation of Stewart L. UDALL, Secretary of the Interior, Petitioner,**

**v.**

**FEDERAL POWER COMMISSION, Respondent,**

Pacific Northwest Power Company, Idaho Wildlife Federation, Idaho Public Utilities Commission, Idaho Fish and Game Commission, Washington State Sportsmen's Council, Inc., et al., State of Oregon, et al., Intervenors.

Nos. 18728, 18729, 18731.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 16, 1965.

Decided March 24, 1966.

Mr. Northcutt Ely, Washington, D. C., with whom Messrs. C. Emerson Duncan, II, Jerome C. Muys, David B. Beers and Joseph H. Sharlitt, Washington, D. C., were on the brief, for petitioner in No. 18,728.

Mr. S. Billingsley Hill, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Ramsey Clark and Mr. Roger P. Marquis, Atty., Dept. of Justice, were on the brief, for petitioner in No. 18,731.

Mr. Peter H. Schiff, Atty., F. P. C., with whom Messrs. Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol. and Joel Yohalem, Atty., F. P. C., were on the brief, for respondent.

Mr. Hugh Smith, Portland, Or., with whom Mr. Richard M. Merriman, Washington, D. C., was on the brief, for intervenor Pacific Northwest Power Co.

Mr. Thomas J. Jones, III, Boise, Idaho, with whom Mr. Peyton G. Bowman, III, Washington, D. C., was on the brief, for intervenors Idaho Public Utilities Commission and Idaho Fish and Game Commission.

Mr. Charles B. Roe, Jr., Asst. Atty. Gen., State of Washington, Olympia, Wash., submitted on the brief for petitioner in No. 18,729.

Mr. John O. Graybeal, Seattle, Wash., with whom Mr. C. Frank Reifsnyder, Washington, D. C., was on the brief, for intervenor Washington State Sportsmen's Council, Inc., and certain other intervenors.

Messrs. Robert Y. Thornton and Lloyd G. Hammel, Salem, Or., were on the brief for intervenor State of Oregon.

Before WILBUR K. MILLER, Senior Circuit Judge, and DANAHER and BURGER, Circuit Judges.

WILBUR K. MILLER, Senior Circuit Judge:

### Nos. 18,728 and 18,729

On June 26, 1964, Washington Public Power Supply System[1] and the Department of Conservation of the State of Washington filed with us separate petitions for review of an order of the Federal Power Commission dated February 5, 1964, and an amendatory order dated April 30, 1964. For reasons set forth in the Commission's opinions, these orders, taken together, granted to Pacific Northwest Power Company, a privately owned corporation, and denied to the Power Supply System, a license to construct a hydroelectric project at the High Mountain Sheep dam site on the Snake River between Oregon and Idaho.

Both petitioners contended before the Commission, and contend here, that the Power Supply System, a municipality which on April 24, 1961, had applied for a license for a High Mountain Sheep project at the same site as that previously proposed by Pacific Northwest, was

1. The System is a joint operating agency composed of sixteen public utility districts of the State of Washington, organized to construct, acquire and operate facilities for the generation and transmission of electricity. It is a municipality within the meaning of Sections 3(7) and 7(a) of the Federal Power Act, 41 STAT. 1064, 1067, 16 U.S.C. §§ 796(7) and 800(a).

entitled to preference over Pacific Northwest under Section 7(a) of the Act, 16 U.S.C. § 800(a), which is in pertinent part as follows:

"In issuing * * * licenses where no preliminary permit has been issued * * * the Commission shall give preference to applications therefor by States and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission be made equally well adapted, to conserve and utilize in the public interest the water resources of the region * * *."

This statutory provision undoubtedly gave the Public Power System preference over Pacific Northwest (provided its application met all requirements) if no preliminary permit had been issued.

Pacific Northwest insists that a preliminary permit had been issued to it, and was extant when it applied for the High Mountain Sheep license. On the other hand, the petitioners argue that Pacific Northwest's preliminary permit was limited to the Mountain Sheep and Pleasant Valley dam sites described in it and did not cover the High Mountain Sheep site. They further assert that Pacific Northwest's preliminary permit was terminated when the Commission declined to issue a license covering the sites therein described. Thus, the controlling question before us is whether, in fact and in law, a preliminary permit covering the High Mountain Sheep site had been issued and was still valid when the Power Supply System applied for a license covering the same site. In other words, does the priority afforded by a preliminary permit apply only to a project for waterway development on the exact site described in the permit, or does it include a project on a different site for developing essentially the same portion of the waterway, which is determined to be best adapted to comprehensive development of that waterway?

The proceedings began on November 9, 1954, when Pacific Northwest filed with the Commission an application for a preliminary permit for a Mountain Sheep-Pleasant Valley project on the Snake River, which it described as two low dams on sites above the point where the Imnaha River empties into the Snake. The sites were 21 miles apart, the lower being only 3.7 miles above the High Mountain Sheep site now in controversy. The Commission issued a preliminary permit to Pacific Northwest April 8, 1955, to expire March 31, 1958. It designated the project as No. 2173 and described it as it had been described in the application.

On September 7, 1955, Pacific Northwest applied to the Commission for a license on the Mountain Sheep-Pleasant Valley project No. 2173, describing it in the terms used in the permit application and the preliminary permit. After a hearing, the Commission denied the application on January 28, 1958, on the ground that the plan proposed was not that best adapted to the development of the middle Snake River. It said:

"It is readily apparent from the studies presented in House Document 531, in Senate Document No. 51, and from those prepared by the Staff for the Middle Snake Basin that any combination of projects which includes Nez Perce is consistently superior to any combination of projects which does not include Nez Perce."

On March 31, 1958, the last day of its preliminary permit, Pacific Northwest filed an application for a license for the High Mountain Sheep project, which was docketed as No. 2243. The project was described as a single high dam at the High Mountain Sheep site instead of the two low dams originally contemplated at the Mountain Sheep and Pleasant Valley sites. Nearly two years later, on March 15, 1960, the Power Supply System applied to the Commission for a Nez Perce project, designated as No. 2273. That site is below the mouth of the Salmon River and about three miles downstream from the High Mountain Sheep site.

We here reproduce a sketch of the reach of the Snake River involved in these cases, showing its tributaries and the various dam sites mentioned in this opinion.

The Commission consolidated the application of Pacific Northwest for the High Mountain Sheep site with that of the Power Supply System for the Nez Perce location and a hearing on the two applications was conducted by an examiner.[2] Before a determination had been made by him, the Power Supply System on April 24, 1961, moved to amend its Nez Perce license application and proposed as an alternative that, if the Commission no longer regarded the Nez Perce site as best adapted to comprehensive development of the Snake River, it should be licensed to construct a High Mountain Sheep project on the site proposed by Pacific Northwest more than three years before.

2. The Secretary of the Interior intervened and asserted, *inter alia*, that a dam at the Nez Perce site, which is downstream from the mouth of the Salmon River, would interfere unduly with runs of anadromous fish up that stream.

On February 5, 1964, the Commission departed from its earlier dictum about the Nez Perce site and found that the High Mountain Sheep site was best adapted to a comprehensive plan for developing the Snake and Salmon Rivers because its location above the mouth of the Salmon eliminated the adverse effect on runs of anadromous fish in the Salmon River which probably would be caused by a Nez Perce dam below the Salmon's mouth. As to the conflicting applications, the Commission sustained its examiner's holding that the Power Supply System's application for a license for the High Mountain Sheep site was not entitled to preference, under Section 7(a) of the Act, over the earlier application of Pacific Northwest because the preference applies only where no preliminary permit has been issued.[3]

The legal question whether Pacific Northwest's preliminary permit was limited to the particular sites proposed in its application therefor, or was broad enough to cover the project on another site which was found by the Commission to be best adapted to a comprehensive development of that reach of the Snake River, was answered by the Commission in its opinion. It refused to adopt the narrow conception of a preliminary permit contended for by our petitioners, and, as we have said, held that Pacific Northwest's permit gave it priority with respect to the High Mountain Sheep site.

In doing so, the Commission said, in part:

"A preliminary permit is issued under Section 4(f) of the Act to enable an applicant for a license to make studies and gather data and at the same time under Section 5 to maintain its priority of application. Section 4 (f) specifically states that the permits are to enable applicants to secure the data and perform the acts required by Section 9. The latter requires that each applicant submit to the Commis-

sion 'maps, plans, specifications and estimates of cost as may be required for a full understanding of the proposed project.' Section 5 refers to the permit as being for the sole purpose of maintaining priority for a period, not exceeding three years, 'for making examinations and surveys, for preparing maps, plans, specifications, and estimates, and for making financial arrangements.' The statute limits the purpose of the permit to priority to avoid any interpretation that it represents permission to begin construction. The statute does not prevent but clearly contemplates that proposals and plans made at the time the permit was issued may be changed as a result of investigations made by the permittee. At the same time the permittee is protected by the permit from rival applicants while incurring expenses in the investigation of a project intended and required by Section 10(a), to be best adapted to a comprehensive development of the reach of the river involved.

"We consider it evident that the statutory intent of these provisions is to give a permittee the first rights to develop that reach of a river to which the permit relates. Any other interpretation would make the permit meaningless, for if another party could obtain a permit or apply for a license for a nearby project that would develop substantially the same head as the one described in the original permit, there would be no protection to the first permittee. * * * *"

The Commission also said in discussing the question:

"To interpret the priority afforded by a permit as limited to a single project would also be contrary to the two most significant objectives of the Act, namely, to encourage the development of our nation's water resources, and to insure that such development would be best adapted to the fullest use of the river, considering all uses.

3. It held that the preliminary permit issued to Pacific Northwest for Project 2173 entitled that company to preference under

Section 5 of the Act, 16 U.S.C. § 798, with respect to the High Mountain Sheep site.

Who would be willing to undertake substantial and expensive investigations looking toward development of a river if a permit were good only in the event—the unlikely event—that the results of the investigations coincided precisely with the permittee's guesstimate at the time the permit application was filed? In this connection, it is the experience of the Commission that a project is rarely constructed at the same exact site and in the same fashion as originally contemplated. Indeed, we are unaware of a single instance where this is true. * * * "

■ Where an administrative agency must and does initially determine the specific application of a statutory provision, as the Commission has done in these cases, the reviewing court's function is limited to deciding whether the administrative interpretation has " 'warrant in the record' and a reasonable basis in law." National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944); California Company v. Udall, 111 U.S. App.D.C. 262, 296 F.2d 384 (1961). See also in I. C. C. v. J-T Transport, 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961), Mr. Justice Frankfurter's dissent, which was joined by Mr. Justice Harlan and Mr. Justice Stewart. In the dissent, at page 127, 82 S.Ct. at page 234 it was said:

"Administrative agencies are not only vested with discretion in sifting evidence and in making findings but may also draw on their specialized competence for ascertaining the reach and meaning of statutory language. Compare Social Security Board v. Nierotko, 327 U.S. 358, 368–371 [66 S.Ct. 637, 642–644, 90 L.Ed. 718], with [National Labor Relations] Board v. Hearst Publications, 322 U.S. 111, 128–131 [64 S.Ct. 851, 859–860, 88 L.Ed. 1170]. The factors to be considered on judicial review of such an administrative determination include the precision of the statutory language, the technical complexity of the relevant issues, the need for certainty as against experimentation, and the likelihood that Congress foresaw the precise question at issue and desired to express a foreclosing judgment on it. * * * "

This was not contradicted by the majority opinion, and we regard at as an apt, and because of its source a cogent, statement of the principle contained in it.

■■ We hold that, measured by the guidelines of these cases, the Commission had the authority and the duty to interpret the priority provision in the first instance, and its interpretation should be affirmed unless it is unreasonable as a matter of law or clearly contrary to congressional policy. That the Commission's priority determination does not offend in these respects is apparent, we think, from an examination of pertinent provisions of the Federal Power Act.

Section 4(e) of the Act, 16 U.S.C. § 797(e), authorizes and empowers the Commission to issue licenses

" * * * for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States * * *."

Realizing that in many instances applications for such licenses cannot be prepared in final form without prior investigation of available sites, which may be and often is costly and time-consuming, Congress also authorized and empowered the Commission in Section 4(f) of the Act, 16 U.S.C. § 797(f), to issue preliminary permits for the purpose of enabling applicants to secure the data and perform the acts required by Section 9, 16 U.S.C. § 802: such maps, plans, specifications and estimates of cost as may be required for a full understanding of the proposed project; and satis-

factory evidence of compliance with the applicable laws of any state involved.

Section 5 of the Act, 16 U.S.C. § 798, provides that each such preliminary permit

" * * * shall be for the sole purpose of maintaining priority of application for a license under the terms of this Act for such period or periods, not exceeding a total of three years, as in the discretion of the Commission may be necessary for making examinations and surveys, for preparing maps, plans, specifications, and estimates, and for making financial arrangements. Each such permit shall set forth the conditions under which priority shall be maintained. Such permits shall not be transferable, and may be canceled by order of the Commission upon failure of permittees to comply with the conditions thereof or for other good cause shown after notice and opportunity for hearing."

Section 10(a) of the Act, 16 U.S.C. § 803(a), requires that all licenses shall be on condition

"[t]hat the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval."

■ Obviously, the purpose of Sections 4(f) and 5 is to afford protection to the entrepreneur willing to invest his time and money in determining exactly where and in what form to propose construction of a project which will be best adapted to a comprehensive plan for im-. 

proving or developing a waterway and the improvement and utilization of water-power development. It would be manifestly unfair to one who has expended large sums of money over a long period of time in the necessary investigation if, upon completion and subsequent application for a license, a state or municipality could step in and reap the fruit of his labors by obtaining a license for the site so laboriously determined upon, merely because of the preference granted by Section 7(a). It was to prevent such unfairness that Congress provided for preliminary permits which would maintain priority, and also provided that the preference granted to public bodies by Section 7(a) should not prevail over them.

■ The petitioners' primary position that Pacific Northwest's preliminary permit which described two low dams in the Mountain Sheep-Pleasant Valley project was limited to exactly that project is almost tantamount to a contention that a preliminary permit is substantially equivalent to a license, that is to say, that a license can be granted only for the project described in the permit. In so contending, the petitioners ignore the command of Section 10(a) that the project as finally approved and adopted "shall be such as *in the judgment of the Commission* will be best adapted to a comprehensive plan for improving or developing a waterway * * * [and] for the improvement and utilization of water-power development * * *." (Emphasis added.) Obviously, the Commission is charged with implementing the policies of the Act. It is entitled to such flexibility as will conform to the statutory objectives. The Supreme Court has pointed out as much in Civil Aero. Bd. v. State Airlines, 338 U.S. 572, 577–578, 70 S.Ct. 379, 94 L.Ed. 353 (1950). See also Federal Com. Comm'n v. Pottsville Broadcasting Co., 309 U.S. 134, 142–143, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

■ It is further contended by the petitioners that the Commission's denial of Pacific Northwest's application for a license for the Mountain Sheep-Pleasant

Valley dam sites terminated its preliminary permit as of the date of the denial January 28, 1958. We reject the contention. Under Section 5 of the Act, the Commission may cancel a preliminary permit "upon failure of permittees to comply with the conditions thereof or for other good causes shown *after notice and opportunity for hearing."* (Emphasis added.) The Commission did not order cancellation of Pacific Northwest's preliminary permit when the Mountain Sheep-Pleasant Valley license application was denied but, as its subsequent actions showed, regarded the permit as thereafter in full vigor.

Moreover, the finality of the project description in the preliminary permit, which is the nub of petitioners' argument, is negated not only by the fact that the Commission's primary concern is in the development of waterways and water-power, as Congress directed in Section 10(a), but also by that section's concluding clause, which shows that the projects to achieve that development are not confined to those first suggested by an applicant:

> " * * * [A]nd if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval."

We hold therefore that the Commission's action here is not unreasonable as a matter of law and not clearly contrary to congressional policy but, on the contrary, was authorized by its governing statute. The orders under review will be upheld.

Affirmed.

### No. 18,731

The Secretary of the Interior's petition for review of the same two orders of the Federal Power Commission challenges the action of the Commission in refusing to recommend that the High Mountain Sheep project be constructed and operated by the United States.

He asserts (a) that Congress has preempted the High Mountain Sheep site "in its comprehensive plan for regulating the flow of the waters of the Columbia River system;" and (b) that the Federal Power Act forbids the Commission to license for private development a project that will affect existing or planned federal development of water resources. The Secretary of the Interior also asserts (c) that "the Commission erred in failing to require an independent staff study and to permit the Secretary to offer evidence respecting federal development."

■■ With respect to the Secretary's assertion (a), referred to in the preceding paragraph of this opinion, we need do no more than cite the *Roanoke Rapids* case,[4] in which the Supreme Court rejected a similar argument. Section 7(b) of the Act, 16 U.S.C. § 800(b), commits solely to the Commission the task of deciding whether the development of any water resources for public purposes should be undertaken by the United States itself. Unless the Commission's action is arbitrary—without basis in the record—we have no power to disturb it. We think in this case the Commission was amply justified in refusing to recommend federal development and in issuing a license for private construction.

The Secretary's broad assertion (b), outlined above, cannot be sustained. It would, if literally accepted, mean that the existence of one federal dam in a waterway would require that any future dams therein be federally constructed. Manifestly, there is no such requirement: the Snake River itself is already developed by a mixture of federal and non-federal projects. If the Commission had found that private development of the project would have a significant adverse effect on existing or planned federal projects, it might justifiably have recommended, under Section 7(b),[5] that federal con-

4. United States ex rel. Chapman v. Federal Power Comm'n, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953).

5. 16 U.S.C. § 800(b):
   "(b) Whenever, in the judgment of the Commission, the development of any

struction be undertaken, even though Congress has not pre-empted the site. There is no such finding here, however, and we find nothing in the record to justify that conclusion.

The Secretary's assertion (c), summarized above, is rejected. Suffice it to say that his long delay in opposing the grant to Pacific Northwest—the hearing had been concluded for over a year and the examiner's decision had already been rendered when the Secretary finally moved to intervene—was sufficient to warrant denial of his motion.[6] Nevertheless, the Commission permitted intervention limited to the filing of exceptions to the examiner's decision and participation in oral argument before it. Various communications from the Secretary were admitted in evidence. In these circumstances, we think the Secretary has no cause to complain that he was not permitted to introduce evidence which he has not proffered or described.

Affirmed.

water resources for public purposes should be undertaken by the United States itself, the Commission shall not approve any application for any project affecting such development, but shall cause to be made such examinations, surveys, reports, plans, and estimates of the cost of the proposed development as it may find necessary, and shall submit its findings to Congress with such recommendations as it may find appropriate concerning such development."

6. The Secretary of the Interior was more than once specifically invited to participate in the proceedings, but for a period of about two years did nothing.