Alfred G. ZABEL and David H. Russell, Plaintiffs,

v.

R. P. TABB, Colonel, Corps of Engineers, District Engineer, Department of the Army, Jacksonville, Florida, District; and Stanley R. Resor, Secretary of the Army, and United States of America, Defendants.

Civ. No. 67–200.

United States District Court
M. D. Florida,
Tampa Division.

Feb. 17, 1969.

---

Charles S. Carrere, Asst. U. S. Atty., Tampa, Fla., for plaintiffs.

Thomas M. Harris, of Harris & Harris, St. Petersburg, Fla., for defendants.

## OPINION

KRENTZMAN, District Judge.

This case involves Section 10 of the Rivers and Harbors Act, 1899, 30 Stat. 1151, 33 U.S.C. § 403 (1964) and the Fish and Wildlife Coordination Act of 1958, 48 Stat. 401, as amended, 16 U.S. C. § 661 et seq. (1964).

The parties suggest and research of the court indicates that this is a case of first impression.

Plaintiffs applied for Department of the Army permit to dredge and fill in navigable waters under Section 9 of the Rivers and Harbors Act. Defendants denied the application and plaintiffs seek relief in one of several ways.

After denial of motion for lack of jurisdiction the court heard at pretrial conference motions for summary judgment by plaintiffs and defendants, respectively. Having considered the papers submitted and excellent memoranda and argument the court enters summary judgment for plaintiffs for the reasons given.

## FACTS

There is no issue as to the following:

1. Title of plaintiffs to the submerged land and all questions concerning the interest of plaintiffs and the public, respectively, under the laws of the State of Florida were considered and decided in favor of plaintiffs in Zabel v. Pinellas County Water and Navigation Control Authority, Fla., 171 So.2d 376.

2. As required by the rule in Cummings v. Chicago, 188 U.S. 410, 23 S.Ct. 472, 47 L.Ed. 525, plaintiff obtained consent or approval from all local agencies

having jurisdiction to prohibit the work on a state level, to-wit: Pinellas County (Fla.) Water and Navigation Control Authority, Trustees of the Internal Improvement Fund of the State of Florida, Central and South Florida Flood Control District, and Board of Pilot Commissioners for the Port of St. Petersburg (Pinellas County, Florida).

3. The United States District Engineer, who heard the application at public hearing found:

"2. Location of proposed work: Boca Ciega Bay, Pinellas County, near St. Petersburg, Florida. The area in question is located approximately a mile from the channel of the Intracoastal Waterway, Caloosahatchee River to Anclote River, Florida."

"4. Character of proposed work: The proposed work consists of the construction of a bulkhead and bridge and to dredge and fill, the dredged material to be deposited inside the bulkhead to form an island in Boca Ciega Bay at applicants' property lying east of Pasadena Avenue, South, in a portion of Section 25, Township 31S, Range 15E, and Section 30, Township 31S, Range 16E, Pinellas County, Florida. The alternate plan submitted with Tab 2 to Inclosure 5 would reduce the size of the fill and of the dredging area, and provide a culvert instead of a bridge."

"5. a. The Pinellas County Water and Navigation Control Authority permit (Tab 23 to Inclosure 6) was issued pursuant to a court order from the Florida Circuit Court having jurisdiction."

"b. The work is opposed by the Board of County Commissioners of Pinellas County."

"c. The work is opposed by the County Health Board of Pinellas County."

"d. Both the original and the alternate plans are opposed by the U. S. Fish & Wildlife Service."

"e. The work is opposed by the Florida Board of Conservation."

"7. Views of District Engineer concerning probable effect on:

"a. Navigation, present or prospective: The proposed work would have no material adverse effect on navigation. The surrounding waters are quite shallow and able to support only limited light draft local boating, although the proposed fill would improve water depths in the immediate area. Since the fill material would be taken from the bay bottoms and placed at elevations extending above the water line, the total volume of tidal flow into and out of Boca Ciega Bay would not be reduced. Although numerous other fills which have been placed in Boca Ciega Bay in the last 15 years have unquestionably created blockages to navigation in certain areas; the dredging which has been performed to create the fills has also improved navigation conditions in the same area."

"b. Harbor lines: No harbor lines have been established and none are anticipated in the area."

"c. Flood heights and drift: The work would have no effect."

"d. Beach erosion or accretion: The work would have no effect."

"e. Fish and wildlife resources: The evidence presented by the U. S. Fish & Wildlife Service in correspondence and at the public hearing, together with evidence presented by numerous other persons at the hearing, clearly indicates that the work would have a distinctly harmful effect on the fish and wildlife resources in Boca Ciega Bay."

(References are to paragraphs First Endorsement of District Engineer to the report which ultimately reached the Secretary of the Army. Exhibit B, Memoranda of Defendants, filed November 24, 1967).

4. The Secretary of the Army, in denying the application, found that issuance of the permit:

"1. Would result in a distinctly harmful effect on the fish and wildlife resources in Boca Ciega Bay,

"2. Would be inconsistent with the purposes of the Fish and Wildlife Coordination Act of 1958, as amended (16 U.S.C. § 662.)

"3. Is opposed by the Florida Board of Conservation on behalf of the State of Florida, and by the County Health Board of Pinellas County and the Board of County Commissioners of Pinellas County, and

"4. Would be contrary to the public interest."

(Paragraph a. 4th Endorsement, Memorandum of Defendants, filed November 24, 1967.)

5. At pretrial, plaintiffs stipulated:

"—that there was evidence before the Corps of Army Engineers sufficient to justify an administrative agency finding that our fill would do damage to the ecology or the marine life on the bottom."

6. Plaintiffs contend and defendants have admitted in discovery proceedings that the District Engineer found:

"That the proposed work would have no material adverse effect on navigation."

## OPINION

█ The rule is well established that a court may not overturn a determination of an administrative agency upon a question committed to the agency's judgment unless such agency's "findings were contrary to law, were arbitrary or capricious, or were unsupported by substantial evidence * * *." General Motors Corp. v. United States, 6 Cir., 324 F.2d 604 (1963).

Thus, the threshold question is whether the action of the Secretary was within the discretion committed to his judgment.

Section 10 of the Rivers and Harbors Act provides:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to the beginning of same." (30 Stat. 1151, 33 U.S.C. § 403 (1964)).

Clearly this section vests discretionary authority to deny a permit "to build or commence the building of any * * * bulkhead * * * or other structure * * * in any * * * navigable * * water of the United States" upon adequate findings supported by substantial evidence that work would obstruct the navigable capacity of any such waters. Here the findings were to the opposite effect.

Defendants urged that the Fish and Wildlife Coordination Act vests supplemental discretionary authority in the Secretary of the Army so that when read in pari materia he can deny such a permit upon findings other than those relating to navigation. Sections 662(a), (b), (h) of the Fish and Wildlife Coordination Act are as follows:

"(a) Except as hereafter stated in subsection (h) of this section, whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose

whatever, including navigation and drainage, by any department or agency of the United States, or any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular state wherein the impoundment, diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resources development." (16 U.S.C. § 662(a)).

"(b) In furtherance of such purposes, the reports and recommendations of the Secretary of the Interior on the wildlife aspects of such projects, and any report of the head of the State agency exercising administration over the wildlife resources of the State, based on surveys and investigations conducted by the United States Fish and Wildlife Service and such State agency for the purpose of determining the possible damage to wildlife resources and for the purpose of determining means and measures that should be adopted to prevent the loss of or damage to such wildlife resources, as well as to provide concurrently for the development and improvement of such resources, shall be made an integral part of any report prepared or submitted by any agency of the Federal Government responsible for engineering surveys and construction of such projects when such reports are presented to the Congress or to any agency or person having the authority or the power, by administrative action or otherwise, (1) to authorize the construction of water-resource development projects or (2) to approve a report on the modification or supplementation of plans for previously authorized projects, to which

sections 661–666c of this title apply. Recommendations of the Secretary of the Interior shall be as specific as is practicable with respect to features recommended for wildlife conservation and development, lands to be utilized or acquired for such purposes, the results expected, and shall describe the damage to wildlife attributable to the project and the measures proposed for mitigating or compensating for these damages. The reporting officers in project reports of the Federal agencies shall give full consideration to the report and recommendations of the Secretary of the Interior and to any report of the State agency on the wildlife aspects of such projects, and the project plan shall include such justifiable means and measures for wildlife purposes as the reporting agency finds should be adopted to obtain maximum overall project benefits."
"(h) The provisions of sections 661–666c of this title shall not be applicable to those projects for the impoundment of water where the maximum surface area of such impoundments is less than ten acres, nor to activities for or in connection with programs primarily for land management and use carried out by Federal agencies with respect to Federal lands under their jurisdiction. Mar. 10, 1934, c. 55, § 2, 48 Stat. 401; 1939 Reorg.Plan No. II, § 4(e), (f), eff. July 1, 1939, 4 F.R. 2731, 53 Stat. 1433; Aug. 14, 1946, c. 965, 60 Stat. 1080; Aug. 12, 1958, Pub.L. 85–624, § 2, 72 Stat. 564."

An analysis of the quoted portions of Section 662 indicates:

(1) That it relates to any body of water being modified for any purpose by any agency of the Federal Government or by anyone under Federal permit.

(2) It requires the department or agency to "consult" with conservation agencies of the Federal and State governments before proceeding with any Federal project with a view toward "determining means and measures that shall be adopted to prevent the loss of or

damage to such wildlife resources," and requires that reports of such conservation agencies "shall be made an integral part of any report prepared or submitted by any agency of the Federal Government * * * when such reports are submitted to the Congress * * * or to any agency * * * having the authority * * * by administrative action * * * to authorize the construction of water-resource development projects * * *."

"The reporting officers in project reports of the Federal agencies shall give full consideration to the report and recommendations of the (conservation interests) * * * on the wildlife aspects of such projects, and the project plan shall include such justifiable means and measures for wildlife purposes as the reporting agency finds should be adopted to obtain maximum overall project benefits."

"The provisions of * * * (the quoted sections) shall not be applicable to those projects for the impoundment of water where the maximum surface area of such impoundment is less than ten acres * * *"

Defendants cite a portion of the legislative history of the 1958 amendment incorporated in those sections as found in Senate Report 1981, 85 Congress, Second Session, accompanying the amendment bill H.R. 13138, as reported in 1958 U.S.C.Cong. and Adm.News, page 3451 as follows:

"The legislation would be a permissive law so far as it concerns relationship between water project construction agencies and fish and wildlife conservation agencies. The latter would not be given any veto power over any part of the water resources development program." (1958 U.S.Code Cong. and Adm.News, p. 3451).

and argued that while there is no veto power in the Fish & Wildlife Service that the Corps of Engineers may, in the exercise of its discretion, determine that fish and wildlife consideration are so important as to deny an application on a basis of unreasonableness or to protect "the public interest."

Thus it appears that the quoted sections attempt to cover generally a wide scope of activities with the emphasis on large Federal projects and upon the modification thereof to protect wildlife with little if any attention to clear authority or procedure to be followed where private projects are concerned. It is interesting to note that under defendant's theory the agency having "veto power" is not the one having the expertise in conservation matters but is the agency having specific authority under other legislation to undertake or approve water projects, who defendants suggest are enjoined to "consult with" and "give full consideration to" the reports of the conservation agencies.

This is the authority claimed by the defendants here in denying by the exercise of the police power of the Federal Government the right of private individuals to use property to which their ownership is not contested, in a way admittedly not otherwise prohibited by law.

In this case the District Engineer held a public hearing after which he made findings and recommended denial of the application for a permit without additional hearing or information. Three additional individuals in the Corps of Engineers chain of command confirmed his recommendations by indorsement and eventually the Secretary of the Army denied the application upon the same findings and for the same reasons.

Defendants suggest the applicability of Udall v. Federal Power Commission, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967). Since great emphasis is placed thereon it will be discussed in some detail. Advocates of private and public power projects contested their respective rights to a license from the Commission. After long and extended hearing before an examiner the Federal Power Commission affirmed the recommendations of the examiner that the private power companies receive a license to construct hydro-electric power proj-

ects at High Mountain Sheep on the Snake River in the Pacific Northwest. The Court of Appeals approved the action, 123 U.S.App.D.C. 209, 358 F.2d 804 and the Supreme Court granted certiorari, 385 U.S. 927, 87 S.Ct. 286, 17 L.Ed.2d 210. A divided court reversed, directing remand to the Commission. Mr. Justice Douglas wrote the majority opinion, Mr. Justice Harlan dissented with an opinion in which Mr. Justice Stewart joined, and Mr. Justice Fortas did not participate.

The Court stated the primary question involved an interpretation of Section 7(b) of the Federal Water Power Act of 1920 as amended concerning the relative merits of federal versus non-federal development and whether Congress or the Commission should make the ultimate decision as to the construction proposed. (Page 431 of opinion, 87 S.Ct. 1712). The Court cited the authority under which the Commission acted as 49 Stat. 840, 16 U.S.C. Section 797(e).

> "Whenever the contemplated improvement is, in the judgment of the commission, desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, a finding to that effect shall be made by the commission and shall become a part of the records of the commission."

The Commission solicited the views of the Secretary of the Interior. The Secretary requested a postponement for the purpose of accomplishing studies as to the effect on fisheries but the hearing was continued and ultimately closed without receiving or considering evidence from him. After the record was closed but before the decision, the examiner received and included in the record a petition from the Secretary that a recommendation be made to Congress to consider authorizing Federal construction of the project. The Secretary was allowed to file exceptions to the record and briefs. The examiner found that there "is no evidence in this record that

Federal development will provide greater * * * fish passage, navigation or recreation; and there is substantial evidence to the contrary." (Page 433 of opinion, 87 S.Ct. 1712, page 1715).

The remand was for the purpose of allowing "an exploration of these neglected phases of the cases as well as the other points recommended by the Secretary." (Page 450 of opinion, 87 S.Ct. 1712, 1724).

Upon consideration of the authority under which the Federal Power Commission acted it is understandable why no issue was made in Udall as to the relevance of the views of the Secretary of the Interior. Traditionally, his duties have included those of representing and protecting conservation in the Federal Domain. As noted, the Federal Water Power Act itself places a burden upon the Commission to consider "other beneficial public uses, including recreational purposes." No such relevant words appear or can by logical interpretation be found in the law under which defendants here operated. This case does not decide or point the way toward a decision in the case under consideration.

Defendants also place great reliance on United States ex rel. Greathouse v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L. Ed. 1250 (1933). There, Dern petitioned in the appropriate court of the District of Columbia for a Writ of Mandamus to compel Dern, the Secretary of War, to authorize construction of a wharf in navigable waters. The lower court denied the petition and on certiorari the Supreme Court affirmed. That Court said:

> "It is apparent that petitioners are entitled to the relief prayed *only* if several doubtful questions are resolved in their favor." (Page 357, 53 S.Ct. 616) (Emphasis supplied).

Among those questions were whether a mandatory duty is imposed on the Secretary by Section 10 of the Rivers and Harbors Act to authorize the construction if he is satisfied that it will not in-

terfere with navigation and several other questions which generally concerned the plaintiff's ownership of the property, whether petitioners had legal right to construct the wharf absent the Secretary's authorization and finally whether any rights of petitioner were not in fact subordinate to the right of the United States, as proprietor and sovereign, to use said property as part of the right-of-way for the George Washington Memorial Parkway, the authority for and location of which Congress had approved. The Court said that it would consider all those "doubtful" questions together, that the allowance of the remedy of mandamus is controlled by equitable principles and that a *Court* of equity, in the exercise of sound discretion could withhold the grant thereof. It further held that the denial of the writ should be affirmed "even if petitioner's title to the upland adjacent to the river and their right to build the wharf were less doubtful than they are."

*Greathouse* is not determinative of the case at bar.

 The taking, control or limitation in the use of private property interests by an exercise of the police power of the government for the public interest or general welfare should be authorized by legislature which clearly outlines procedure which comports to all constitutional standards. This is not the case here.

As this opinion is being prepared the Congress is in session. Advocates of conservation are both able and effective. The way is open to obtain a remedy for future situations like this one if one is needed and can be legally granted by the Congress.

This Court has jurisdiction and there is no genuine issue as to any material fact.

 Section 10 of the Rivers and Harbors Act of 1899, 30 Stat. 1151, 33 U.S.C. § 403 (1964) even if said statute is read in pari materia with the U. S. Fish and Wildlife Coordination Act, 48 Stat. 401, as amended, 16 U.S.C. § 661 et seq., does not vest the Secretary of the Army with discretionary authority to deny an application for a dredge and fill permit thereunder where he has found factually that the construction proposed under the application would not interfere with navigation.

Much is made here of the choice of remedies available to the Court. While each of the several possible ones have traditional uses and limitations, the need for relief to plaintiff having been established the Court has power to grant the relief.

At hearing the Court announced its ruling and subsequent thereto defendants filed a motion to stay to which plaintiff has not objected.

Being advised, it is,

Ordered and adjudged:

1. The defendants' motion to amend their answer to request for admission No. 9 be and the same is hereby granted.

2. The plaintiffs' motion for summary judgment be and the same is hereby granted.

3. The defendants' motion for summary judgment be and the same is hereby denied.

4. The defendant, R. P. Tabb, and the defendant, Stanley R. Resor, Secretary of the Army, or their respective successors in office, are hereby directed to issue a permit from the Department of Army in accordance with the application of plaintiffs.

5. Said defendants are hereby ordered not to interfere with plaintiffs' dredging and filling operations so long as the same are carried out in conformance with their application and the permit herein ordered to be granted.

6. Defendants' motion to stay be and is hereby granted, and performance and compliance by defendants hereunder and herewith is stayed until a timely appeal of this case is considered and decided by the United States Court of Appeals for the Fifth Circuit.